*Decision will be entered under Rule 50.*

ETHERIDGE AND VANNEMAN, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 86895.   Filed June 3, 1963.

*DeJongh Franklin*, for the petitioner.
*Arthur P. Tranakos*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies and claimed additional deficiencies for the periods and in the amounts as follows:

| Taxable period ending: | Deficiency |
|---|---|
| Sept. 1, 1954 to June 30, 1955 | [1] $27, 092. 36 |
| June 30, 1956 | [2] 32, 469. 91 |
| June 30, 1957 | 39, 590. 40 |

[1] Includes an increased deficiency claimed by the respondent in the amount of $5,980.36 in amendment to answer filed on Jan. 5, 1962.

[2] Includes an increased deficiency claimed by the respondent in the amount of $9,940.43 in amendment to answer filed on Jan. 5, 1962.

The issue here presented is whether or not the servicing contract between petitioner and Bowery Savings Bank effective during petitioner's fiscal years ending June 30, 1955, 1956, and 1957, gave rise to accruals as of the end of said respective fiscal years in excess of the actual payments at level payment rates made to it by Bowery pursuant to said servicing contract.

Respondent acknowledges that the transfer of assets from the petitioner to the Commercial Trust Co. in exchange for stock was a nontaxable transaction as provided by section 351, I.R.C. 1954. This disposed of the issues raised by the petitioner in paragraphs 4(k) and 4(l) of its petition.

All other issues presented by the pleadings have been disposed of by a stipulation of disposition of certain issues filed with the Court on April 10, 1961.

FINDINGS OF FACT

Some of the facts are stipulated and are incorporated herein by reference.

The petitioner is a Georgia corporation with its principal offices at 66 Pryor Street NE., Atlanta, Ga.

The petitioner filed Federal income tax returns for the taxable periods ending June 30, 1955, 1956, and 1957, with the director of internal revenue for the district of Georgia, Atlanta, Ga.

The principal business of the petitioner during its taxable periods ending June 30, 1955, 1956, and 1957, was the financing and servicing of mortgage loans.

The petitioner and the Bowery Savings Bank, New York, N.Y., referred to hereinafter as Bowery, entered into an agreement dated July 20, 1950, with subsequent amendments dated July 7, 1953, November 1, 1953, and August 30, 1954. The agreement, dated August 30, 1954, canceled all prior servicing agreements. A copy of said agreement of August 30, 1954, is incorporated herein by reference and is identified as Exhibit 4–D. It is referred to herein as Mortgage Servicing Agreement. Those portions of said agreement here significant are set forth in appendix I hereof.

Under the agreement with Bowery, mortgage contracts to be serviced by the petitioner were sold to Bowery pursuant to a commitment letter issued by it. A copy of a typical commitment letter is incorporated herein by reference, is identified as Exhibit 5–E, and is set forth in appendix II hereof.

Under the terms of the servicing agreement, petitioner agreed to service mortgages purchased by the Bowery by collecting monthly payments of principal and interest and accounting therefor to Bowery. The agreement contemplated that Bowery may purchase mortgages from the petitioner, or from a third party, and refer them to petitioner for servicing.

The mortgage servicing agreement and the commitment letter dealing with any particular mortgage to be serviced prescribes the method of determining compensation due the petitioner for servicing mortgages under the servicing contract.

The rate of compensation prescribed by the servicing contract is referred to as "level payment rate."

Prior to 1953, Bowery compensated the mortgage servicer by a basic rate of compensation. Compensation is determined under the basic rate of compensation by multiplying a predetermined interest rate (for example, one-half of 1 percent) by the current monthly

outstanding principal balance of the mortgage loan which produces a decreasing amount of compensation each month over the life of the mortgage. For example, in the case of a 29-year 4½-percent $12,000 mortgage loan, a mortgage servicer, being compensated under the basic rate of compensation on the basis of one-half of 1 percent, receives aggregate fees in the first year of the mortgage of $59.53 and $1.97 in the 29th year of the mortgage. This method of compensation is referred to herein as "basic rate compensation."

Under the level payment rate, a predetermined rate (such as 25 cents for each $1,000 of effective principal balance) is multiplied by the whole number which is determined when the effective principal balance is divided by $1,000. (For example, if the effective principal balance is $10,000, this is divided by $1,000 which produces the whole number of 10.) This produces a constant monthly amount expressed in dollars and cents paid to the mortgage servicer each month throughout the life of the agreement or throughout the life of the loan.

Under the servicing contract, the petitioner agreed, *inter alia*, to collect payments due from the mortgagor, to see that taxes are paid and insurance coverage maintained, and to remit funds collected to Bowery. For these services, the petitioner was entitled only to receive monthly servicing fees computed upon the level payment rate as set forth in the mortgage servicing agreement.

Under a level payment rate, compensation paid to a mortgage servicer will be the same every month throughout the life of the loan. This is approximately in line with the expense being incurred by the mortgage servicer since the cost of servicing is substantially the same in the first month of the term of a loan as in the last month of the term of a loan. This provided protection to Bowery in event of a default in the latter years of a mortgage loan since Bowery would have difficulty getting a new mortgage servicer to take over the servicing of such a mortgage loan at the low amount of compensation which would be payable under a basic rate of compensation in the latter years.

Under the servicing contract, the petitioner is compensated at a level payment rate of so many cents per $1,000 of effective principal amount of the mortgage being serviced and petitioner receives a uniform monthly servicing fee over the life of the mortgage loan.

While the servicing contract is in existence, the petitioner has agreed by the servicing contract to service for the "investor" (Bowery), all mortgages purchased by the investor from the petitioner and also those mortgages acquired from third parties and referred to the petitioner by Bowery for servicing. Thereafter, from time to time when the petitioner has assembled a group of mortgages, they are offered for sale to Bowery which then sends the petitioner a "commitment letter"

in which it agrees to purchase the specified mortgages at a stated price on condition that the petitioner service them under the existing service contract for a servicing fee negotiated in connection with the particular acquisition. Additional mortgages may be purchased from the petitioner from time to time, or additional mortgages may be purchased by Bowery from other lenders and referred to the petitioner for servicing, all of which will be serviced under the existing servicing agreement at a rate and under a method of compensation set forth in the mortgage servicing agreement.

One of the purposes of the commitment letter (app. II) is to serve as a contract by Bowery to purchase the mortgages specified therein for an agreed price. The commitment letter also provides that mortgages so purchased shall be serviced by the mortgage contractor under and subject to existing service contract, and fixes the method of determining under the mortgage servicing agreement the rate of level payment to be received therefor by the mortgage contractor.

The amount of compensation to be received by the petitioner is provided in the mortgage servicing agreement. Petitioner receives monthly compensation equal to the so-called "level payment rate" set opposite the basic rate in a table set forth in the contract. The level payment rate is expressed as a number of cents "per $1,000 of effective principal amount" which is defined by the mortgage servicing agreement as the principal balance of a particular mortgage remaining unpaid at the time the petitioner begins to service the mortgage under the servicing contract. The "effective principal amount" does not change during the entire period that the mortgage continues to be serviced. For example, in the case of a mortgage serviced by the petitioner under a level payment rate of 25 cents per $1,000, if, at the commencement of servicing the mortgage, the remaining unpaid principal balance was $10,000, then the petitioner will receive $2.50 per month until the mortgage is repaid.

The so-called level payment rate is the only compensation to which the petitioner is entitled other than certain adjustments which are prescribed by the contract in the event of termination. It is not entitled to receive, and does not receive, any amount other than the $2.50 per month under the assumptions in the example just given. In this connection, paragraph 3(a) of the servicing contract provides, in part, as follows:

3. *Compensation of the Contractor.*

(a) *Method of Computation.* The monthly compensation of Contractor with respect to each mortgage shall be computed as follows:

For each One Thousand Dollars ($1,000) of effective principal amount (as hereinafter defined) of such mortgage, the Contractor shall receive an amount equal to the level payment rate set opposite the applicable basic rate (as hereinafter defined) in the following table. * * *

Under the contract when the servicing of a particular mortgage is completed at the end of its prescribed term, that is over the normal life of the mortgage, no adjustment is made between Bowery and the petitioner to compensate for any excess or shortage between the amount of level payment made to petitioner and the amount which petitioner would have received under a basic rate of compensation. The petitioner is not entitled to any amount other than the level payment computed under paragraph 3(a) of the contract in such an event.

Under the mortgage servicing agreement, paragraph 3(d)(i) deals with terminations without fault on the part of the petitioner and paragraph 4 deals with the terminations by Bowery "for cause," i.e., due to the occurrence of any one of eight stated events all of which involve a breach by the petitioner of certain conditions which give Bowery the right to terminate the contract. The effect on the petitioner's compensation through termination under the two separate divisions of the contract is different.

Paragraph 3(d)(i) provides that if (a) a mortgage is prepaid in full; (b) a mortgage is foreclosed; (c) the servicing agreement is canceled by Bowery "with or without cause," or (d) the mortgagor defaults in his obligations under a mortgage, the petitioner's right to compensation ceases, subject to the adjustments provided. If the compensation already received by the petitioner by way of level payments exceeds the compensation which would have been received had it been computed by means of the basic rate, the petitioner must repay the excess to Bowery. If the aggregate amount of level payment compensation received to date of termination is less than the compensation the petitioner would have received had it been entitled to compensation under the basic rate, the Bowery agrees to pay the petitioner the excess "as additional compensation."

Paragraph 4 of the contract sets forth eight acts or omissions of the petitioner, any one of which will permit the servicing contract to be terminated at the option of Bowery. These may be summarized as follows:

(1) Assignment of the petitioner's rights or duties under the contract;

(2) The petitioner's merger with or consolidation into another corporation without prior written consent of Bowery;

(3) Sale of substantially all of petitioner's assets without prior written consent of Bowery;

(4) Change in stock ownership of the petitioner resulting in transfer of voting control to different persons without prior written consent of Bowery;

(5) Breach of any warranty, misrepresentation or failure of the petitioner to continue to meet requirements of Paragraph 9 of the mortgage servicing agreement (dealing with qualification to do business as a mortgagee approved by the Federal Housing Administration and the Veterans Administration);

(6) Bankruptcy, reorganization, or receivership of the petitioner;

(7) Incapacity or inability to perform its duties;

(8) Failure of the petitioner to perform its duties.

The petitioner kept its books of account and filed its United States corporation income tax returns upon an accrual method of accounting during each of the taxable years in question and also during the entire period that the mortgage servicing agreement had been in effect. The petitioner carried the difference between the level payment rate and basic rate on its books in a ledger account entitled "Bowery Compensation Account" and this difference appears on its balance sheet affixed to the tax returns of petitioner as an asset entitled "Mortgage Servicing Compensation Fund." The net increase in the Bowery Compensation Account of petitioner for each of the taxable years ended June 30, 1955, 1956, and 1957, was $11,500.71, $19,116.23, and $13,248.41, respectively. The controversy involved here is whether petitioner should have reported as income the amount of net increase in the Bowery Compensation Account maintained by the petitioner in those taxable years. The petitioner reported as income realized under the mortgage servicing agreement in those taxable years only the actual payments received under the level payment rate.

For its own accounting purposes, Bowery maintains an account entitled "Accounts Payable—Contingent Compensation—S e r v i c e Charges." To this contingent account Bowery credited in 1955, 1956, and 1957, the difference between the mortgage servicing fees computed on the basic rate and the mortgage servicing fees actually paid to the petitioner under the level payment rate. Bowery is not required by the servicing contract to maintain this contingent account or any reserve for the benefit of mortgage servicers. Bowery has never paid to any mortgage servicer any interest on any portion of the funds in this account, and has never made any payments to any mortgage servicer out of this account.

OPINION

Petitioner, on the basis of a mortgage servicing contract with Bowery, included in gross income for the years in question, the compensation which it accrued and received in accordance with the so-called level payment rate provided in the servicing contract. Respondent takes the position that petitioner is required to include amounts which respondent claims should have been accrued as basic rate compensation in excess of the amounts received by petitioner under the level payment plan.

The identical issue, in principle, was considered in *Guarantee Title & Trust Co.* v. *Commissioner*, 313 F. 2d 225 (C.A. 6, 1963), reversing a Memorandum Opinion of this Court (T.C. Memo. 1961–122), the Court of Appeals holding in accordance with the view here presented by the petitioner.

To avoid duplication of discussion of facts, and of argument, we refer to and quote at considerable length, from the language of the

Court of Appeals. *Guarantee Title & Trust Co.* v. *Commissioner*, *supra*.

The Court of Appeals noted that under basic rate compensation the mortgage company is compensated by a fixed fee based upon a fixed percentage of the principal amount of the mortgages being serviced and outstanding from month to month. The Court of Appeals observed that this formula would obviously result in a constantly diminishing amount being paid to the mortgage company over the life of the mortgages, since the fee represents a percentage of the monthly outstanding principal balances of the mortgages being serviced. In consequence, in the later years of the mortgages, monthly compensation received by the mortgage servicing contractors would necessarily become relatively small, although it would be safe to assume that the expenses to the mortgage company in servicing the contract would remain fairly constant throughout the entire life of the mortgages.

The level payment plan of compensation is a method under which the servicing contractor is compensated at a level rate of so many cents per $1,000 of effective principal amount of the mortgages being serviced, and the mortgage company receives a uniform monthly fee over the entire life of the mortgage loan rather than a constantly diminishing amount.

On August 30, 1954, a servicing contract was entered into between petitioner and Bowery which was substantially identical in principle with that involved in *Guarantee Title & Trust Co.* Under this contract, the taxpayer agreed to service all mortgages purchased by the Bowery from it or referred to it for servicing, and to perform the specific services described in the contract. The actual mortgages serviced under the contract were purchased by the Bowery from the taxpayer pursuant to so-called "commitment letters," the chief purpose of which was to serve as a contract by Bowery to purchase the mortgages set forth therein for an agreed price. The commitment letters provided that the mortgages so purchased should be serviced by the mortgage contractor under and subject to the existing servicing contract.

During the years here in issue, petitioner serviced a number of mortgages for Bowery under the servicing contract of August 30, 1954, for which it received compensation on a level payment rate. For accounting purposes, petitioner carried the difference between the basic rate and the level payment rate on its books in a ledger account entitled "Bowery Compensation Account." The net increase in this account for the 3 taxable years ending June 30, 1955, 1956, and 1957, were $11,500.71, $19,116.23, and $13,248.81, respectively. The taxpayer in *Guarantee Title & Trust Co.* kept similar records. Petitioner herein (as well as the taxpayer in *Guarantee Title & Trust Co.*)

filed its income tax returns and kept its books on an accrual method for the years in issue and reported as income only those amounts of level payment compensation received by it. The Commissioner in *Guarantee Title & Trust Co.* added to taxpayer's income the increases reflected on its books, determining that such increases were properly accrued by it in the taxable years in question. He takes the same position here.

We approved the ruling of the Commissioner in our Memorandum Opinion (T.C. Memo. 1961–122). In connection therewith, the Court of Appeals said, in part (pp. 226–228):

In approving this ruling of the Commissioner the Tax Court, in our opinion, misconstrued the contract * * *.

As we construe these provisions, the contract is one which essentially provides for the level payment plan of compensation. Under its terms the only absolute and unconditional right which vested in the Taxpayer during the taxable years with respect to compensation, was the right to be compensated at the level payment rate based upon the effective principal amount of each mortgage. During those years the right to receive any amount of compensation in excess of the level payments actually made was subject to the occurrence of certain conditions precedent, including prepayment in full of the loan, foreclosure, assignment by the mortgagee, or any other event giving rise to termination without cause. If the loan being serviced should run its normal course to maturity, or if the contract should be terminated for cause as a result of the occurrence of one of the events specified in * * * the contract, the Taxpayer is entitled only to the level payments theretofore received by it. Additional compensation in excess of the level payment rate is provided for in * * * the contract. If servicing of a particular mortgage should be terminated by one of the events specified therein, the Taxpayer would become entitled *at that time* to "additional compensation" in an amount equal to the excess of compensation which would have been payable to that date under the basic rate over the level payment compensation already received. The Taxpayer would be required, on the other hand, to repay the excess to The Bowery in such event if the level payment compensation exceeded compensation at the basic rate. We are unable to escape the conclusion that the Taxpayer's right to any amount in addition to the level payments received was at all times contingent upon the occurrence of the specified conditions precedent.

It may be conceded, as pointed out by the Tax Court and by the Commissioner, that if a particular mortgage runs its full term, the basic rate compensation and the level payment rate would produce the same total amount. But the test is not the amount received by the Taxpayer upon completion of the servicing of the mortgage, but the nature and character of its right during *the taxable years*. We find that its only fixed and accrued right during those years was to receive compensation at the level payment rate.

It is well settled under such circumstances that there can be no accrual. * * *

 *  *  *  *  *  *  *

If the right to receive income is contingent upon the happening of a future event, the right cannot be said to arise or exist in the taxable year to be accounted for as income under the accrual method of accounting. * * * So in this case, the Taxpayer was required to account only for the level payment com-

pensation actually received during the taxable years. The contract provides for no other compensation for current servicing of mortgages. The Tax Court, in stating that the typical commitment letter specifically provides that the petitioner is to receive compensation at the basic rate and mentions no other possibility, fails to take into account the fact that the servicing contract is the underlying instrument providing for compensation to the Taxpayer and that the commitment letter itself, while mentioning the basic rate, refers to the servicing contract to fix the exact terms of compensation. We do not consider that the commitment letter in any way alters or modifies the controlling provisions of the servicing contract pertaining to compensation.

Nor do we regard it as of significance that the Taxpayer created an asset account and a corresponding liability account on its books reflecting the amounts by which its compensation, if computed on the basic rate, would have exceeded the compensation it received at the level payment rate. The Bowery also maintained on its books an account to which it credited the excess thus computed. These bookkeeping entries might be of some significance in indicating the intention of the parties if the contract in question were ambiguous or uncertain in meaning. But we do not regard the contract here in question as ambiguous on the point under consideration. Even if it should be so regarded, any effect of these entries as reflecting intent would appear to be largely offset by the fact that the Taxpayer did not treat the amount on its books as income for tax purposes, nor did the Bowery treat the same amount on its books as accrued expense and has never claimed a deduction for such amount for income tax purposes. The entries were apparently made solely for the internal accounting purposes of the parties.

The Commissioner's reliance upon the "dealer's reserve" cases, of which Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, is the leading example, is, in our opinion, misplaced. The rationale of this case and others of like import is that the amounts retained by the finance company in a "dealer's reserve" account must be used in all events to satisfy the obligations of the dealer. The amounts so held are part of the purchase price which the dealer had a fixed right to receive. It is immaterial that because of a future contingency the dealer might never receive the amount of the reserve in cash, since it must be applied to discharge the dealer's legal obligation. Cf. Opinion of Judge Shackelford Miller, Jr. in Schaeffer v. Commissioner of Internal Revenue, supra, 258 F. 2d 861. Under the income tax law the payment of a legal obligation of a taxpayer constitutes taxable income. Old Colony Trust Co. v. Commissioner, 279 U.S. 716.

We have carefully reanalyzed our own Memorandum Opinion referred to above (T.C. Memo. 1961–122) in the light of the views expressed by the Court of Appeals (*Guarantee Title & Trust Co.*). It is our view that there is no distinction between *Guarantee Title & Trust Co.* and the case before us and we have determined to follow the opinion of the Court of Appeals. We therefore reach the conclusion that respondent erred in holding that there accrued, in the years in question, basic rate compensation in excess of the payments actually due to petitioner by Bowery at the level payment rate.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

APPENDIX I

\*      \*      \*      \*      \*      \*      \*

3. *Compensation of the Contractor.*

(a) *Method of Computation.* The monthly compensation of Contractor with respect to each mortgage shall be computed as follows:

For each One Thousand Dollars ($1,000) of effective principal amount (as hereinafter defined) of such mortgage, the Contractor shall receive an amount equal to the level payment rate set opposite the applicable basic rate (as hereinafter defined) in the following table:

| Basic rate of compensation: | Level payment rate per $1,000 of effective principal amount (cents) |
|---|---|
| ⅛ of 1% | 10 |
| ¼ of 1% | 12½ |
| ⅜ of 1% | 18¾ |
| ½ of 1% | 25 |
| ⅝ of 1% | 31¼ |
| ¾ of 1% | 37½ |

For the purposes of this agreement, the applicable basic rate of compensation shall be (i) in the case of a mortgage purchased from Contractor, the basic rate specified in the commitment letter between Bowery and Contractor pursuant to which such mortgage was acquired (or the servicing agreement under which such mortgage was heretofore serviced) and (ii) in the case of a mortgage purchased from a seller other than Contractor, such basic rate as shall be agreed to by Bowery and Contractor or the rate specified in the servicing agreement under which such mortgage was heretofore serviced.

(b) *Method of Payment.* Contractor shall submit monthly bills (on forms prescribed by Bowery) to Bowery for the compensation payable pursuant to the foregoing subparagraph with respect to all mortgages being serviced hereunder and Bowery shall promptly verify and pay the same to Contractor. Such compensation shall not be deducted by Contractor from moneys collected by it.

Compensation computed in accordance with subparagraphs (a) and (b) of this Paragraph 3 is hereinafter sometimes called "level payment compensation".

(c) *Mortgages Held by the Life Insurance Department of the Bowery.* Anything herein to the contrary notwithstanding, in the case of any mortgage serviced by Contractor for the Life Insurance Department of Bowery, Contractor will, if so requested in writing by Bowery, deduct from collections and retain its compensation for servicing such loan at the applicable servicing rate or rates.

(d) *Adjustment in Compensation.*

(i) *In case of termination.* If and whenever any of the following events shall occur, viz:

(a) any mortgage shall be prepaid in full, or

(b) any mortgage shall be foreclosed or the property subject thereto shall be acquired by Bowery without foreclosure, or

(c) this agreement shall be cancelled by Bowery as to any or all of the mortgages, with or without cause,

(d) Contractor surrenders and relinquishes charge of any mortgage pursuant to Paragraph 1(o) hereof,

Contractor's right to compensation for servicing any such mortgage shall forthwith cease, except as hereinafter provided.

In any of the foregoing events, if (i) the aggregate level payment compensation received by Contractor in respect of any such mortgage from the date of

commencement of servicing hereunder (or under any prior agreement between the parties hereto) to the date of occurrence of such event shall exceed (ii) the aggregate compensation for such period which Contractor would have received in respect of such mortgage at the applicable basic rate of compensation on actual monthly principal balances thereof, Contractor shall, out of its own funds, forthwith pay to Bowery an amount equal to such excess.

In any of the foregoing events (except cancellation of this agreement pursuant to Paragraph 4 hereof) if (i) the aggregate compensation which Contractor would have received in respect of any such mortgage for the period specified in the preceding sentence at the applicable basic rate of compensation on actual monthly principal balances thereof exceeds (ii) the aggregate level payment compensation which Contractor has received during such period in respect of such mortgage, Bowery will forthwith pay to Contractor as additional compensation hereunder the amount of such excess.

(ii) *In case of assignment.* Anything herein to the contrary notwithstanding, upon the assignment of any mortgage by Bowery, Bowery may at its option elect to require an adjustment as if such mortgage so assigned were then prepaid in full. If Bowery's assignee shall elect to continue the servicing of such mortgage hereunder, Contractor's compensation with respect to such mortgage thereafter shall (i) be at the applicable basic rate of compensation based on the outstanding principal balances of such mortgages from time to time, and (ii) be retained by the Contractor from moneys collected by it each month in respect of such mortgage, unless a different arrangement shall be agreed to by such assignee and Contractor.

(iii) *In case of split-service rate arrangement.*

    A. * * *

    B. * * *

    C. * * *

    D. * * *

4. *Termination for Cause.*

If any of the following events shall occur, i.e.:

(a) Contractor shall assign or attempt to assign or delegate its rights or its duties hereunder, or

(b) Contractor shall merge with or consolidate into any other corporation without the prior written consent of Bowery, or

(c) Contractor shall sell or otherwise dispose of all or substantially all of its property and assets without the prior written consent of Bowery, or

(d) there shall occur (without the prior written consent of Bowery) any change in the stock ownership of Contractor, the effect of which shall be that effective voting control of Contractor shall pass from the persons now exercising such control to others, or

(e) any representation or warranty of Contractor hereunder shall be found to be untrue or any representation or warranty contained in subparagraphs (a) or (b) of Paragraph 9 shall at any time cease to be true, or

(f) Contractor shall institute proceedings for voluntary bankruptcy, or shall file a petition seeking reorganization under the Federal Bankruptcy Laws or for relief under any other law for the relief of debtors, or shall consent to the appointment of a receiver of all or substantially all of its property, or shall make a general assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts as they become due, or shall be adjudged a bankrupt or insolvent by a court of competent jurisdiction, or if an order shall be made by a court of competent jurisdiction appointing a receiver, liquidator or trustee of Contractor or of all or substantially all of its property or approving any petition filed against Contrac-

tor for its reorganization, and such adjudication or order shall remain in force or unstayed for a period of twenty days, or

(g) Contractor shall otherwise become incapacitated by operation of law or fact for the faithful performance of its duties pursuant to the terms of this agreement, or

(h) Contractor shall fail to perform any of its duties hereunder or under any other agreement between Bowery and Contractor and shall fail, within fifteen days after written notice from Bowery, to correct or cure such failure, then in any such event the rights and duties of Contractor and its right to compensation hereunder shall, at the option of Bowery, immediately terminate and thereupon Contractor shall forthwith deliver to Bowery (A) all documents relating to all mortgages being serviced hereunder, including but not limited to ledger cards, tax bills, accrual records and hazard insurance policies and (B) a statement showing the monthly payments by it collected and a statement of all moneys held in trust by it for the payment of maintenance and other charges in respect of each and all of the mortgages and shall immediately pay over to Bowery all moneys so held.

\*        \*        \*        \*        \*        \*        \*

## APPENDIX II

THE BOWERY SAVINGS BANK,
*110 East 42nd Street,*
*New York 17, N.Y., November 10, 1954.*

ETHERIDGE AND VANNEMAN, INC.,
*66 Pryor Street, N.E.,*
*Atlanta, Georgia.*

### Re: COMMITMENT NUMBER(S) A 694.

GENTLEMEN: We are pleased to advise you that we are willing to purchase the bonds or notes and mortgages or deeds of trust listed under the above commitment number(s) subject to the following terms and conditions, namely:

1. (x) Insured by the Federal Housing Administration under Title II of the National Housing Act, bearing interest at 4½%.

(x) Guaranteed by the Veterans Administration under Title III, Section 501 of the Servicemen's Readjustment Act of 1944, as amended—to the extent of 60% of principal (but not exceeding $7500) bearing interest at 4½%.

2. Our attorneys, Messrs. Cadwalader, Wickersham and Taft, of 14 Wall Street, New York 5, New York, and our local counsel, have been directed to proceed with the necessary steps in this matter to arrange for the closing of said transactions, upon your submission to them of the mortgage papers, title report and policy, copy of survey, assignment, final inspection reports, and all other papers pertaining to the mortgages, which must meet with their approval as to form and legal sufficiency. Upon request, you shall submit such papers and documents to Cadwalader, Wickersham and Taft prior to submission to our counsel in New York.

3. These mortgages are to be serviced by Etheridge and Vanneman, Inc., at the rate of ½ of 1% under and subject to existing contract.

4. It is understood that these mortgages are to be purchased at a price of & equal to the outstanding principal of such balances.

5. This commitment is good until October 15, 1955 after the effective date hereof, but shall be considered void if at the time when we would otherwise make payment of the purchase price of the investments, the premises in question are damaged or the value thereof adversely affected. No mortgage will be accepted which is in arrears in any manner at the time of delivery.

6. Unless the original lender and all subsequent holders, if any, of the investment or persons having or having had any right, title, interest or claim, legal or equitable, of any sort or nature in the investment prior to the time of the assignment to us, are corporations duly incorporated under the laws of the State in which the mortgaged properties are located or duly and fully licensed and qualified to do business in that State, and in either event in good standing in that State, or national banks duly incorporated under the laws of the United States to have principal office in that State, we reserve the right to terminate our obligations hereunder unless the documents, place and circumstances of execution thereof and all relevant surrounding facts and circumstances are such that in the opinion of New York and local Counsel referred to in item numbered 2 hereof, neither the undersigned, nor any successor or assign of the undersigned or anyone else which may have at any time any interest in the investment shall be subject to any fine, penalty, disability, (whether to sue in the courts of the State in which the mortgaged properties are located, or any other sort or kind of disability), forfeiture or liability. Evidence satisfactory to our attorneys as to the matters referred to herein shall be furnished by you on request.

7. No broker, agent or other person is authorized to represent us in any way in connection with this transaction except officers or employees acting for us in New York City and except our attorneys as aforesaid, also acting for us in New York City, and it is understood that we shall purchase such investment in New York City, subject to approval of Counsel and the other terms and conditions hereof.

8. This commitment is issued subject to the express condition and your continuing warranty and representation that no fees or charges in excess of those permitted by applicable local schedule pursuant to Section 36; 4312 of the Veterans Administration Regulations and/or F.H.A. Regulations will be or have been charged, imposed or received.

9. This commitment is based on the further condition that the furnishing of construction money is not conditional upon the issuance of this commitment, and that no construction money lender is authorized by us to issue its commitment for such construction funds on the basis of this commitment by us.

10. The terms of this letter may not be waived or modified or in any way changed by implications or through subsequent conduct, correspondence or otherwise, unless such waiver, modification or change be expressly stated as such in a written request therefor and specifically agreed to by both parties in writing.

11. The identity of the person with whom it deals being deemed of material importance to us, this letter is written upon the distinct condition that our obligations hereunder shall in no event be assignable without our prior written consent in each instance, the granting of such consent in any given instance not being a waiver of this requirement as to any subsequent instance.

12. This commitment shall become effective only upon receipt by us at our office in New York City of the enclosed copy signed by you, within ten (10) days after the date hereof.

13. Additional Conditions:

Terms: 30 years.

Commitment number: A–694.

Bond: Approved purchasers whose credit is satisfactory to The Bowery Savings Bank.

Amount: Approximately 3 individual mortgages not to exceed $9,000 each. Total amount not to exceed $27,000.

Location: Willow Run, Talmadge Highlands Subd., Athens, Clarke Co., Georgia.

Strict compliance by you with your letter of submission to us dated October 18, 1954 (a copy of which, initialed for identification purposes, is returned herewith) pursuant to which said mortgages were offered to us.

Very truly yours,

THE BOWERY SAVINGS BANK,

(S) F. C. S.,

FRED C. SMITH,

*Vice President and Mortgage Officer.*

Approved and Accepted:

(Signed) F. S. KEY, V.P.

By ETHERIDGE AND VANNEMAN, INC.

Date: _____.